We will hear argument first this morning in Case 21-12, Federal Election Commission v. Ted Cruz for Senate. Mr. Stewart. Mr. Chief Justice, and may it please the Court, Appellees' suit should be dismissed for lack of standing, but if the Court reaches the merits, it should reverse the District Court's judgment and hold that the statutory loan repayment limit is constitutional. Appellees lack standing for two reasons. First, although they have directed their challenge to the statutory loan repayment limit, appellees stipulated below that the first $250,000 of Senator Cruz's loan was repaid with pre-election funds. The statute, therefore, does not currently restrict the Senator's ability to obtain full repayment of his loan. Second, the current regulatory barrier to repayment is self-inflicted. Appellees could have avoided any injury simply by behaving exactly as they would have if the statute and regulation did not exist. Instead, they went out of their way to engage in transactions that they would not otherwise have undertaken, solely to subject the Senator to a financial loss and thereby lay the groundwork for a lawsuit. That deliberate self-infliction of injury, for no purpose other than to facilitate litigation, severed the causal link between the challenged laws and Senator Cruz's injury. On the merits, the loan repayment limit is constitutional. It imposes insubstantial burdens on the financing of electoral campaigns, and it targets a practice that has significant corruptive potential. A post-election contributor generally knows which candidate has won the election, and post-election contributions do not further the usual purposes of donating to electoral campaigns. And because repayment of candidate loans increases the candidate's personal wealth, the conduct the statute regulates implicates the same concerns that underlie limits on gifts to federal officials. I welcome the Court's questions. Mr. Stewart, other than Section 304, is there any other basis for enforcing the regulation? None has been identified so far. So if Section 304 is gone, there is no enforcement? I think there is a substantial practical likelihood that that would be the result. It would still be open to the FEC to examine other provisions of the federal campaign finance laws and ask whether the 20-day limit would continue to serve a valid purpose even without the statute, but we would concede the most likely result, if the statute were declared invalid, is that the regulation would cease to be on the books or would cease to be enforceable. But none of this was litigated below. The district court didn't decide the case on that basis. The district court was under the misimpression that the first $250,000 of Senator Cruz's loan had been repaid with post-election funds. The other thing I would say is, leaving aside the point that the injury was self-inflicted, which I do want to emphasize, there was a more straightforward way that this case could have been litigated. That is, appellees could have identified the regulation as the provision of law that was causing their injury and filed suit to have the regulation set aside. And if they had done that, they could have identified as one potential ground for invalidating the regulation the allegation that the regulation rested on an invalid statute. Now, from an appellee's standpoint, there would have been two disadvantages to pursuing the claim that way. First, if they had identified the regulation as the target of their challenge, they wouldn't have been able to invoke the three-judge court mechanism with a right of direct appeal to this court. And second, they have alleged in counts three through five of their complaint both constitutional and non-constitutional challenges to the regulation. And if they had identified the regulation as the source of their injury, then under usual principles of constitutional avoidance, the court would have been obliged first to consider their non-constitutional challenges to the regulation, and only if those were rejected would it have proceeded to the constitutional issues. Mr. Stewart, is one of your arguments the following? A party cannot challenge the constitutionality of a law that imposes an allegedly unconstitutional restriction on the exercise of a right if the party could have very easily satisfied the preconditions for the exercise of the right? I think we would probably say that, but I don't think it is necessary for the court to go that far to resolve the case in this way. How can that possibly be the law? Suppose a state university says that no person of a particular race may enter any of the university buildings unless that person pauses for two seconds, stands still for two seconds before entering the building. Would you say, well, you can't challenge that racial restriction because it's no big deal to pause for two seconds before you go into the building? I mean, the court in a case like that might say, in the context of race discrimination, that the mere fact of being subject to racially disparate treatment is injury in fact, regardless of whether any other concrete consequence comes of that. Do you think that's limited to an unconstitutional instance of racial discrimination? It wouldn't apply to free speech rights? Well, it's certainly true in general that in order to establish standing, a plaintiff has to allege and then show not just a deprivation of a legal right, but some practical injury. No newspaper may run an editorial criticizing the president unless it's in a particular font? I guess the reason I would say that the court doesn't need to address those more difficult hypotheticals is that at least in order to challenge a limitation like that, the newspaper would have to allege, were it not for this restriction, we would use a different font. What makes this case particularly easy in our view is that appellees could have avoided their injury by doing precisely the thing that they would have done if the statute and regulation were not on the books. Let me give you one more example. A town passes an ordinance that has two sections. Section 1 says no newspaper may run an editorial criticizing the mayor except as provided in Section 2. Section 2 says any editorial criticizing a speech made by the mayor must be published within 20 days after the speech. Would the newspaper, after the 20 days passed, have standing to challenge Section 1 or only Section 2? I'm sorry, could you repeat that? Yeah, okay, it's a little complicated. So, town passes an ordinance. Section 1, no newspaper may run an editorial criticizing any speech delivered by the mayor except as provided in Section 2. Section 2, any editorial criticizing a speech delivered by the mayor must be published within 20 days after the mayor's speech. Can the newspaper, after the 20 days have passed, challenge Section 1 or only Section 2? I think they could probably challenge both, but they would have to say, were it not for this legal restriction, we would publish an editorial critical of the mayor after 20 days. Where does this come from? I mean, I think that it's actually easy to find examples such as we've just heard. I mean, all you have to do is take anything that restricts time. The reason they want to do it after 20 days is because that's what they want. They want to do it after 20 days. So, where does that fact suddenly take standing away? I mean, all you have to do is take any statute you want that you think might be unconstitutional, and you say, it doesn't apply on a certain day. And then you say, oh, they could do it on that day. Or it doesn't apply in a certain place. Or you say, oh, they could go to, you know, the Aleutian Islands. I mean, and some people can very easily. And I just don't know of a case where we've looked into, when they want to do a thing, that the statute forbids, that we've looked how easy it would be to do it in a different way or to do it in a different place or to do it at a different time when they say, we don't want to. What is that case? I'm not saying it doesn't exist. All I can say is I can't find it. I would say Clapper, and it's implicit in TransUnion, but let me come at it this way by saying it's helpful to think of how the standing issue would have played out if the appellees had filed suit seven days before the election and they had said, this provision impairs our constitutional rights by imposing burdens on the use of candidate loans for self-financing. I think for standing purposes, the first question a court would ask is, if this legal restriction were removed or if it didn't exist, would you make a loan to your campaign and would you wait for more than 20 days? And if the answer to that question was no, there would be no standing. That's Carney v. Adams. In Carney v. Adams, the plaintiff challenged Delaware law restrictions on the party affiliations of people who wanted to run for Delaware judgeships. And basically the whole standing analysis was an effort to determine, would this plaintiff actually run for a judgeship if these restrictions were removed? And the court concluded, we have insufficient confidence that he would and therefore there was no standing. Now if you'd asked that question of appellees seven days before the election, the answer would clearly be no standing. They have stipulated that the only reason for making the loan and the only reason for the delay in repayment was to facilitate the lawsuit. And if there had been no statute, no regulation, there would have been no lawsuit to facilitate. So if these laws were not on the books, they wouldn't have made the loan. If they had made the loan, it would have been promptly repaid. They could have avoided injury simply by doing exactly the thing that they would have. The analysis in Carney v. Adams is a lot more concrete than your First Amendment hypothetical. I mean, these cases are hard enough when you're trying to figure, well, what is the weight of the infringement on the First Amendment values against what is the protective effect on potential corruption? I mean, I don't know how you do that in the first place, but to say that the standing is going to depend upon a particular calculation, I think it's much more concrete in Carney v. Adams when you're asking, well, did somebody really go run for office? That's also hard, but not anywhere approaching the indeterminacy of the calculation we're supposed to make here. Well, I think the calculation on the merits may be difficult, and it may involve a complicated balancing, but the calculation on standing, I think, is very straightforward. If the police had filed their suit seven days before the election, and they had said in their complaint, Senator Cruz has no intention of loaning money to his campaign, regardless of the outcome of this suit, but he feels strongly that the statute is unconstitutional, and he would like a judicial determination to that effect. Clearly there would have been no standing, whatever the court thought of the merits of the constitutional claim. And what we have here is essentially that. That is, appellees have stipulated that if there were no statute, if there were no reg, they never would have made the loan, and they would have promptly repaid it if the loan had been made. I mean, test cases are not always, you don't always have a lack of standing. If you get people challenging discriminatory housing practices, and they go in and say, you know, we're thinking about buying this house, and they're discriminated against because of their race, and they don't say, well, you know, whatever, you can't buy the house, they don't have to go in and prove that they would actually buy the house, do they? Well, they might not have to prove that they would buy the house in the same way, for instance, that in the school admissions cases, where you have use of racial criteria in school admissions. The plaintiffs don't have to show that they would have been admitted if the laws were different, but they do have to show they were ready and able to apply. And the question here really is, if they didn't have standing seven days before the election, can they manufacture standing by voluntarily subjecting themselves to an injury solely for the purpose of facilitating a lawsuit? Mr. Stewart, if I might, sir. I do have difficulty understanding this manufacture business because he wasn't precluded from contributing to his campaign, so he could. He was only precluded from repaying it from certain funds. And so I don't know that this is a manufactured injury as such. Can we go to the specific point, or one of your many points on standing, but the one that I'm most concerned about, which is that he, in fact, did have no injury because he had used pre-election funds to repay his debt and there was no bar to him using post-election funds to pay the $10,000. Yes. That's a different kind of situation. That's a different standing argument. That is an argument that the inability that he currently faces to repay the remaining $10,000 is attributable to the regulation rather than to the statute. I'm not even sure it's attributable to the statute. The statute says that you can't use post-election funds to pay off more than $250,000 of pre-election funds. But if he didn't have pre-election debts greater than $10,000, he would still have the money to pay. Well, he loaned the campaign $260,000, so the campaign had a $260,000 debt to him, and it repaid $250,000 of that amount and stipulated that... From pre or post? He alleged in the complaint that he paid it through post-election funds and the district court, at the motion-to-dismiss stage, rejected the standing argument, accepting as true that allegation. But the appellee subsequently stipulated that none of that $250,000 was from money raised after the election, and the stipulation is binding on them. So if they used pre-election funds, then... They claim that they used 2024 election money instead of pre-election money. Why don't we get to their allegations and why you think... I do have... I have read the deposition of one of the assistant treasurers who said he wasn't sure which funds were used. Pre-election or 2024 election money? So the question I have for you is, and he said money is fungible, and our intent was to use 2024 election fund money to pay this debt. Why isn't that enough? Well, first, the 2024 election money that they were talking about was money that was received by the campaign before the 2018 election but was subsequently re-designated for the 2024 campaign because the people who had contributed it were already maxed out for the 2018 election. And we would say those are pre-election contributions because they were received by the campaign before the election. The appellees say the re-designation effected a simultaneous refund of the earlier contribution and the making of a new post-election contribution. And there's a legal dispute about that. One thing I would say about that legal dispute is the position we've taken is the one that is more favorable to campaigns generally. We're saying if you give the money before the election and it's re-designated afterwards that still counts as pre-election contributions so it doesn't count against the $250,000 cap. That's the pro-campaign position. They are taking the anti-campaign position in order to try to buttress their argument that they have been injured. But at the end of the day, they don't even say, we used those funds to repay the debt. They say those funds were available for use and we didn't attempt to trace the money because money is fungible and there was no point to it. But again, all that doesn't go to the self-inflicted character of the injury. Imagine a torch suit in which a plaintiff said, it came to my attention that McDonald's was selling dangerously hot coffee and so I went to McDonald's and bought a cup of coffee and poured it upon myself and I'm suing for costs of medical treatment and for pain and suffering and I stipulate that my only reason for buying the coffee and my only reason for pouring it on myself was to facilitate this lawsuit. I think we all have the strong reaction that suit can't go forward and I think the best doctrinal basis for saying that the suit can't go forward is even if we take as true the allegation that McDonald's was behaving negligently by selling the coffee, the plaintiff's own deliberate conduct in visiting injury upon herself solely in order to facilitate a lawsuit severed the causal link between any wrongdoing and her ultimate injury. And that's basically what the court said in Clapper. The plaintiffs in Clapper said, we have paid out money to take protective measures to prevent our own communications from being intercepted and the court said, if you would otherwise lack standing to challenge the laws that allow the interception of communications on the grounds that your injury is not sufficiently real and immediate, you can't manufacture standing simply through a self-inflicted harm. And the court said, that's a reason for holding that the injury is not traceable to the allegedly unconstitutional statutes. And that's the same position we're advocating here. They didn't have to adjust their conduct even in the most minuscule way to avoid injury. All they had to do was not make the loan or to repay it promptly if they did and crucially, those are exactly the things that they have said they would have done if the statute and reg didn't exist. Again, by saying our only motivation for making the loan and for delaying repayment was to facilitate the lawsuit. Coffee sounds like you. What's the tort doctrine that used to be, you know, two workers and you say it's his fault and the other one says, well, you did a lot of this yourself. I mean, there's contributory negligence. Yeah, that's it. Contributory negligence. Thank you. And I've never heard even in the case if they say, you know, McDonald's is negligent because the coffee was too hot. And then the contributory negligence was, yeah, maybe it was that you poured it on yourself. I never heard of that as being a standing doctor. And so what I think of is the tracing cases where the person says, yeah, I went to see if they'd sell me a house because of my race. I think they wouldn't, but I wasn't going to live there. I just did it as a test case. Well, contributory negligence generally presupposes that, you know, both sides are behaving unreasonably, but it's not a doctrine that typically applies in circumstances where the plaintiff has deliberately caused harm to herself. The McDonald's hypothetical is not simply the plaintiff herself was negligent and not taking good care of the coffee. It was she deliberately caused herself injury that she would not otherwise have suffered solely for the purpose of facilitating a lawsuit. And that's basically what we have here. And I think to the extent there is doubt about the intricacies of the doctrine, it's helpful for the court to think about the purposes of Article III standing doctrine. It is to limit the jurisdiction of Article III courts to disputes that arise because the plaintiff's conduct of his own life is being interfered with in some way. It is to prevent the courts from being used to resolve purely abstract disputes that don't arise out of any actual injury to the plaintiff. And if the plaintiff can circumvent that restriction by manufacturing injury, the principle is lost. I did allude earlier to TransUnion, and in TransUnion the court said, if a plaintiff has not suffered concrete harm as a result of the defendant's legal violation, then the suit can't go forward even if Congress has created an express cause of action with a statutory damages remedy. Speaking of artificial things, could you turn my question on standing into one on the merits? How are you supposed to weigh such imponderables such as the marginal burden on the exercise of First Amendment rights against the marginal assistance in preventing corruption? I mean, there isn't a sufficient anti-corruption interest, sort of up to $250,000, but then all of a sudden there is. Exactly how is that analysis supposed to proceed in concrete terms? I mean, we don't pretend that it's a bright-line rule, but I think we would say two or three different things. The first is there are severe restrictions on gifts to officials in all three branches of the government. So there is an established understanding that the government has a substantial and legitimate interest in preventing the effects that might arise if federal officials were given money that would enrich themselves personally. And the campaign finance laws, in specifying the permissible uses of campaign contributions, draw a line between campaign expenditures that will further the purposes of the campaign and campaign expenditures that will benefit the candidate personally. Why is it that Cruz says that this doesn't enrich him personally because he's no better off than he was before? It's paying a loan, not lining his pockets. He's certainly no better off than he was before the loan was made, but the whole thrust of his argument is after a loan has been made, there may be a legal entitlement to be repaid, but there will often be practical uncertainty about whether repayment will actually occur. And that uncertainty may be sufficiently burdensome as a practical matter that some candidates will not make the loan at all for fear that they'll be left holding the bag. And so a contributor who eliminates that uncertainty, who pays in the money that ensures that the debt will actually be repaid, is conveying a financial benefit to the candidate, just as if a gift had been made. What about everyone who contributes to the campaign in that respect? Well, at the time that pre-election contributions are made, there is still campaign literature to be distributed. There are television ads to be run. There are campaign activities still to be funded. After the campaign is over, the only permissible use of post-election contributions is to repay debts outstanding by the campaign. And in many instances, the only or the principal debt that the campaign owes is to the candidate himself. And if a donor knows that, then the donor will understand that by giving money, he or she is enriching the candidate personally in the sense of making the candidate richer than she would be but for the repayment. Why isn't the $2,900 limit that applies sufficient to address the government's anti-corruption interest, especially given, as Justice Barrett says, it is a loan, not a gift? I think for two reasons. The first is the general $2,900 limit has in mind contributions that will be used for campaign-related activities, for speech. And the limits on gifts to federal officials are much lower, reflecting the insight that we worry about corruption at a much lower monetary level when the money is going into the candidate's pocket. And the other thing I would say is in drafting the $2,900 limit, Congress was attempting to balance the desire to avoid corruption against the desire to enable contributors to participate meaningfully in the electoral process, and that opportunity is basically over once the election occurs. Thank you. Justice Thomas, anything further? Mr. Stewart, just a couple of questions to satisfy my curiosity. One on the merits. If the government determined that certain media outlets had an outsized influence on election, could it similarly limit the amount that they spend on editorials to equalize the influence? No, it could not do that, and it could not do that with candidates. That is, this is not a limit on the amount of money that a candidate can spend or even the amount of money that the candidate can loan. It's purely a limit on the funds that can be used to repay the candidate loan after it's been made. I don't quite see the difference. But, Dr., my final question is, going back to your standing, you said a number of times that these self-inflicted injuries can't be a basis for standing. At least that's what I understand. But how would you, using that at that level of generality, what would you say about Plessy sitting in the wrong car? We would not say that that is self-inflicted in the relevant sense. Well, why not? I mean, it's just all he has to do is go to another car. That is, Plessy is attempting to assert a legitimate constitutional right and is attempting to do something in the real world that presumably he would do if the law were not on the books. That is, if there had been no law mandating segregation on the means of transportation, presumably Plessy would have sat in an integrated section and would have had an interest in doing so. This is self-inflicted not just in the sense, it's a different case when plaintiffs stand on their rights and insist on doing what they would do if the law were not in effect and experience injury as a result of it. This is a case in which the plaintiffs did something they would not otherwise have done solely for the purpose of being injured and then filing a suit. Justice Breyer, anything further? Justice Alito? I'm not sure I understand your explanation why the repayment of this loan is a gift when the repayment of other loans is never considered a gift. If we were writing an opinion in your favor on the merits, how would we explain that? I mean, suppose you have a federal officer who, it has become publicized that he loaned money to somebody and that person defaulted, didn't pay him back. And so the federal officeholder is out $10,000. And some other person comes in and says, I want to make this officer whole because I respect what he's doing. I'm going to give him the $10,000. That would surely be a gift for purposes of the separate limitations on gifts to federal officeholders. In that case, you have the intervention by a third party. You don't have the repayment of the loan by the person to whom the loan was given in the first place. I think the gift rules would cover indirect gifts as well. And so if rather than giving the money directly to the officeholder in my hypothetical, the person had given money to the borrower, the borrower who was otherwise in default and said, I'm giving you this money on the understanding that you will pay it to the officeholder in satisfaction of your debt. I think that would count as a gift for purposes of the gift rules. It would certainly implicate the interests that underlie the gift rules because it would be apparent that the effect of this practice was to make the officer richer than he otherwise would be at this point in time, even though it didn't make him any richer than he had been before the loan was made. Justice Sotomayor? Counselor, the chief asked a question about how do you determine where the risk of corruption arises? Congress has chosen the $250,000 figure. But I guess what he was asking is, is that figure defensible and on the basis of what? I think there are two ways you can defend Congress's ability to set some cap and not simply to impose a blanket prohibition on all use of post election contributions for candidate repayment. The first is Congress can balance competing interests. And the court often says no law pursues its principal objective to the furthest possible degree. So Congress could say we also want to make it feasible for candidates to use loans as seed money to finance their campaigns and we're going to strike the balance. The other thing I'd say is I do think a large outstanding balance creates a corruptive potential that a small one may not because if an officeholder is confident that he will be able to receive enough in post election contributions to repay the loan with a substantial cushion, then no one donor can say I made you richer than I otherwise would be. No one donor will have significant leverage over the candidate. And by contrast, if the loan is large and the candidate is unsure whether repayment will be forthcoming, then each potential donor has greater leverage. And Congress could use a dollar threshold as a rough surrogate for a loan that implicates this uncertainty about whether full repayment will be forthcoming. And with respect to the $250,000 figure in particular, I think that's just the same as what the court said in Buckley about the individual contribution limit, that once we're satisfied that some limit is warranted, we don't probe with a scalpel to determine whether the one that Congress has chosen is the precisely best one. Justice Kagan? Mr. Stewart, part of Mr. Cooper's argument is that we should analogize this to an expenditure limit. In the same way that our law has clearly held you can't limit a candidate's ability to spend money on his own campaign, so too it's a similar burden to say that the candidate can't loan as much money as he wants to to his campaign. And I'm wondering what you think the difference is between those two propositions. I think there are really two differences. First, one of the reasons that the court in Buckley gave for why expenditure limits were no good was that a candidate's own expenditures on his campaign will typically reduce the likelihood of corruption because the candidate will be less dependent on outside contributors for the running of the campaign. And a loan, to the extent that it can be repaid with post-election contributions, really has the opposite effect. It causes the candidate to be more dependent on outside contributors, not just for running the campaign, but for his own personal financial well-being. And the other thing I would say is the court said in Buckley a limit on the amount of money that you can spend on campaign speech is de facto a limit on the amount of speech that you can engage in, because even in the 1976 modern world, let alone the current world, effective electoral speech requires expenditures of money, and so a limit on expenditures limits speech. Here, the impact is much more attenuated and uncertain. That is, when they say that speech will be suppressed, what they mean is some number of candidates will be less willing to lend money to their campaigns or will be willing to lend less money, and as a result, fewer funds will be available to the campaigns to engage in speech. There may be some marginal effect of that nature, but it's much less direct and immediate than a limit on the amount of money that the candidate can actually spend. Justice Gorsuch? You said earlier, Mr. Stewart, it's not a limit on the amount that a candidate can spend or even loan. I want to focus on that, or even loan, because it would seem to me that the law puts the candidate to a choice of spending your own money for a loan above $250,000 or foregoing repayment of any amount above $250,000. So the choice is to spend that without any possibility of getting it back or not spending it at all, and that seems to be, therefore, a chill on your ability to loan your campaign money. Why is that not right? I think the third option is you can loan the campaign as much money as you want, and you can get full repayment as long as the loan is repaid with pre-election funds. Well, suppose, sorry to interrupt, but suppose it's a close election. You're emptying the coffers. It's down to the wire. There are no pre-election funds left. That's how close elections work. You spend it all a lot of times or come close to it. So you have to rely on post-election funds. In that instance, the candidate coming down in the last few days is quite a bit chilled from using his or her own resources above $250,000 because there's no possibility of repayment under this statute, even in $2,900 chunks. I first concede your premise that there will be situations in which, very close to the election, the candidate will be faced with a choice of either limiting the size of the loan he makes or being willing to eat a portion of it. I think the two things I would say are, first, Congress has the objective that it has of reducing candidates' reliance on outside contributors for financial well-being, and Congress can be concerned about candidates who put themselves in their position where, in order to be repaid in full, they have to solicit post-election contributions from donors who know that the candidate has won and know that the donor is dependent on new money in order to be made whole. The second thing I would say is, even if you thought the statute would be unconstitutional as applied to that particular scenario, it wouldn't be a basis for accepting the as-applied challenge here because the campaign here made the loan for an entirely different purpose. One more, sorry, but why allow the $2,900 repayments up to the $250,000 cap then? Aren't those people who give those $2,900 post-election contributions also triggering the same corruption problem that happens with the person who happens to give the $2,900 when the $250,000 cap has been exceeded? I guess the two things I would say are closely related to what I said before. The first is, if the loan is small and the candidate is very confident of it being repaid, then no individual donor will have particular leverage over the candidate. It's $2,900 from each person, and the theory has to be that each person's $2,900 in a post-election contribution triggers some corruption appearance problem. I don't see why that's different where your $2,900 comes in the wall before or after you exceed the $250,000 cap. I agree, and as we said in the opening brief, we think Congress constitutionally could have eliminated all use of post-election contributions to repay candidate loans. Indeed, I think Congress constitutionally could forbid post-election contributions altogether and could say any money that is donated after one election has to be directed to the next one. And the question is just, can Congress attempt to balance competing interests, or can it focus on the very worst manifestations of the behavior without having the statute held unconstitutional? Thank you. Justice Barrett? Mr. Stewart, I want to give you a chance to talk a little bit about the other side of the balance. The chief pointed out we're balancing burdens against the government's interest in stopping corruption, and the court below found that you hadn't introduced sufficient evidence of corruption coming from these post-election contributions, both because there wasn't factual evidence, there was conflicting legislative history, and the difficulties with this YouGov survey. So given that there wasn't any evidence of actual quid pro quo corruption causing problems, do you want to address that? I think maybe the three things I would say are, first, we do think there's an analogy to the gift rules, and so when Congress is building upon an existing body of law, there's less need to make a new record. The second is Congress is owed a certain amount of deference, both because it's a coordinate branch of government and because it has special knowledge about the way that campaign financing works. But even in a case where some heightened scrutiny applies of some sort? I think to the extent that you are asking, is this a realistic fear, or is this a theoretical practice that we would expect to materialize, then yes, you would give some weight to Congress's judgment, even if you're applying heightened scrutiny. Certainly with respect to contribution limits, the court has given some deference to the legislative judgment, even though it applies closely drawn scrutiny. The third thing I would say is we have introduced, I think, significant evidence showing that people in the real world think this is a problem. I don't mean the recipients of the surveys, I mean the commentators, the people who follow politics closely. They may disagree to the extent, but they agree that this is actually a practice of concern. And then the fourth thing I would say is Bikra's been on the books for 20 years, and so in the nature of things, it's difficult to amass empirical evidence about what would have happened if Bikra had not been the law. Thank you, counsel. Thank you. Mr. Cooper? Thank you, Mr. Chief Justice, and may it please the court. The government's arguments against Senator Cruz's standing are meritless. First, even assuming, as the government claims, that Cruz's $10,000 injury was directly caused by the 20-day regulation and not by operation of Section 304 itself. The government cannot escape the fact that the 20-day rule is parasitic to Section 304. It has no life independent of the authorizing statute. And so if Section 304 is invalid, then the 20-day rule is per force also invalid. Nor does it matter whether Cruz's $10,000 injury was self-inflicted, at least since Mr. Plessy sat down in the train car reserved for whites. This court has repeatedly held that a plaintiff who deliberately subjects himself to the injury of unconstitutional government action for the admitted purpose of challenging it has created his standing, not defeated it. On the merits, the government defends Section 304 as a measure that serves to protect against what it says is the special threat of quid pro quo corruption from the use of post-election contributions to repay candidate loans. But Section 304 permits up to $250,000 worth of such post-election contributions. So according to the government, Congress effectively gives a corruption hall pass to the first 86 donors who max out after an election, but abruptly closes the corruption window on donor number 87. That incongruity alone, and there are many others, betrays the genuine and illegitimate purpose of the loan repayment limit. It is to level the playing field, as its sponsor in the Senate openly proclaimed. I welcome the court's questions. Mr. Cooper, could you just take a minute and tell us exactly how this loan repayment regulation or provision affects speech or impedes speech? Is it the speech of candidate Senator Cruz? Is it the speech of his donors? It's one thing to say that, well, it burdens it in some way. But I'd like you just to precisely tell us whose speech and what speech and how it does that. Well, thank you, Mr. Justice. It most dominantly burdens and creates a drag on the campaign speech, on the candidate speech. If a candidate has to go through the calculus of deciding whether or not I'm going to loan more than $250,000 to my campaign because my ability to have it repaid is going to be compromised by the statute and by the regulation, to whatever extent the candidate doesn't loan that additional money, that candidate is foregoing the speech that that additional money would purchase, as Justice Kavanaugh mentioned. Of course, Mr. Cooper, the candidate can spend all the money he wants of his own money. I mean, put aside the loan question, he can spend a gazillion dollars of his own money if he wants to on his campaign, right? That's true. By Constitution. I'm sorry? Under the First Amendment. So this restriction, which is a restriction on loan repayment, is really a restriction on how a candidate can use third parties to finance his speech, isn't it? Your Honor, no more so than any other campaign contribution. Correct. Every time. I think that that's exactly right. It's a restriction on how a candidate can use third parties to finance his speech, which is exactly what contribution limits are. From the candidate's perspective, it's one and the same thing. Is that right? No, Your Honor. A loan is clearly a form of self-financing by the candidate, obviously to whatever extent. Whatever extent that that loan is not repaid, it does become a contribution. But the important thing is— I guess I don't really quite understand the distinction. If this is a restriction on how a candidate can use third parties to finance his speech, not a restriction on how the candidate finances his own speech, but a restriction on third-party financing of the campaign, why isn't it completely identical to contribution limits, which we have a well-established law, which is very different from our law respecting expenditures? Your Honor, when a candidate loans his own money to his own campaign to purchase speech to increase the amount of expression in the advocacy of his own election, as Buckley protects, that candidate is calling upon the candidate's own financial wherewithal. That is expenditure. The statute is strong. For a time, until the third parties repay that money. It's not an expenditure. It's just a financing mechanism. It's a timing mechanism that puts contributions, that enables you to switch contributions at one time to contributions at another time. And, Your Honor, the Congress has placed no limit whatsoever on the amount of loans that a candidate may make and may be paid back with pre-election contributions. The place where this loan restriction creates a drag, Your Honor, is with particularly challengers. And that was its purpose. It creates a drag because a challenger who needs and can't rely on contributions early in a campaign and has to get his campaign off the ground often has to loan that campaign money, Your Honor, and that becomes critical to the campaign's ability to speak on that day, on that day. It just limits the amount of speech that a candidate can make on somebody else's dime. It does not limit the amount of speech that a candidate can make on his own dime. And what I'm suggesting is that when we think about limits on the amount of speech that a candidate can make on somebody else's dime, the appropriate place to look in the law of campaign finance is to the law respecting contribution limits rather than expenditure limits. Well, Your Honor, I would simply push back by saying the statute itself defines loans as a thing of value. It defines loans as an expenditure. Congress recognizes that when a candidate calls upon his own financial resources to fund his campaign, even if it is ultimately a loan and hopefully is going to be repaid by contributions and any other fundraising by the campaign itself, those are the candidate's own funds. And again, Congress itself defined that as an expenditure. However you characterize it, you haven't just answered your own question. And you started out by saying this is very incongruous because you're limited before the election to $2,900. Why? Because we're afraid, I think as a given, that $2,901 will be seen as buying something else in the election. It will be seen as a corrupt thing. Possibility. That's why that's supposed to be okay. All right, so you say now Mr. Jones gives Mr. Smith the same $2,901. But he gives it having known that Mr. Smith was elected. So whatever appearance was there beforehand, it seems to be worse after. You say, but why then do they allow $250,000? And you just answered it. Because with $250,000, you can help candidates challenge incumbents. We can help the candidate who isn't too popular at the beginning but has assurance that I will become. So Congress has two conflicting interests. On the one hand, it wants to help those candidates challenge the incumbents or poor candidates or ones who have great competence. And on the other hand, it doesn't want the $2,901 appearance. You have two conflicting interests. We'll resolve them. Raise the amount. Instead of $2,901, it becomes $250,000. Okay? So what's incongruous about that? I don't see anything incongruous. I just see conflicting interests. And here they have a compromise. What's wrong with that? Your Honor, the contribution-based limits apply whether the contribution is made before the election or made after the election. And, Your Honor, this court said in McCutcheon that so long as the contribution-based limits apply, then Congress has determined that there is no cognizable risk of corruption. So a limit, a contribution made after the election has no more cognizable risk of corruption than one made before the election. But you say, yes, it does. You're right. Absolutely right. The only problem here is in addition to being a contribution or however you want to characterize it, you are also helping the candidate put money up front. And that is a pro. That is a pro-competitive democratic interest. And, therefore, the interest with the interest that we're trying to deal with, the same point I just made, it's not incongruous. There is a risk of corruption once you get to $2,901, but it isn't a pure contribution. It is paying back money that the candidate advanced. And that's a plus. And it's a big plus. And so we say we will, with this particular kind of contribution, which isn't really a contribution, it's a payback, with this particular kind, we'll offset. That's the same point I just made. I just don't see an incongruity in that. Your Honor, it seems, and I would submit to you, it is very incongruous. If Congress, as the government suggests, is concerned about the corrupting effect of post-election contributions, that it has allowed $250,000 worth of those very post-election corrupting contributions. Everybody is, Your Honor, limited by the base contribution limits. All contributors are. But here we have 86 contributors who get to come in and make this alleged gift. Why? Why might Congress want to let them do that? I've said the same thing in my question. I don't know if I need to repeat it, but you haven't quite said why that's a bad reason. Why might they want to do that? They want to do it, and I'll repeat for the third time, because they want to encourage candidates to loan money to their campaign at least for a while until they take off. That's a pro-democratic interest. They actually want to discourage candidates. The whole purpose of Section 304 is to deter candidates from loaning money to their campaign, at least money that might make a difference, money above the $250,000 level. On Justice Breyer's question, I think you're saying if the interests were truly anti-corruption, they shouldn't allow any post-election contributions because each person is similarly situated in terms of threatening that corruption interest, whether it's the first one or the 87th one. Each person might be similarly situated, the first and the 87th, but the candidate is not similarly situated. The candidate with $3,000 of debt is a lot less likely to start thinking about how he can sell his votes than the candidate with $500,000 of debt. So the candidate is in a very different situation the more the debt mounts. Congress here came in and said these are hard things. We're striking balances. We're picking $250,000 at the time where candidates really start worrying about the kind of debt that they have and the kinds of things that they can do to reduce that debt. So even though it is formally true that the 87th person is the same as the first person in terms of they both spent $2,900, at the 87th person, the candidate is in a very different situation and is thinking about those quid pro quos. He's thinking about them, Your Honor, because Congress has not allowed the 87th person to come in and make that claim. I'm glad you have focused on the candidate and the candidate as the candidate is deciding whether he's going to call upon his own financial wherewithal to fund speech, Your Honor, First Amendment political speech. He is going to think twice. Yes, if he can't afford to just give his campaign money, he's going to think twice whether or not he loans more than $250,000 of his own money to advocate his own election. That was the purpose of Section 304 to make sure that the challenger didn't loan more than $250,000 to his campaign or at least that if he did... This goes back to my first question which I think we've probably covered in sufficient detail but it's just the same as Congress saying we're not going to allow a candidate to go get a $500,000 contribution from somebody. That's another way that the candidate could finance his campaign. I'm sorry. This is not candidate expenditure. This is candidate financing of a campaign. It's a structure to allow a candidate to finance a campaign without spending any of his own money. Your Honor, if I understood your point correctly, I don't think it's at all comparable that you have many contributors contributing only the base limit at most versus a single contributor contributing $500,000. The base limits again under McCutcheon and under common sense are Congress's judgment that anything at that amount or below has no cognizable risk of corruption. I was just suggesting that the kind of burden this is is the kind of burden that contribution limits are, not the kind of burden that expenditure limits are and our law treats those two burdens very differently. That's the point I was making. I well understand that. My response is that these are expenditures, Your Honor, and the law that governs contributor limits applies to all of them across the board. But don't you have to say that the first 86 are preferred to the 87. I don't understand why you contest that this is like a gift. I guess this puzzles me. If I have a debt of $10,000 and somebody comes along and says, you're doing such a good job, I'm going to pay that debt off for you. Isn't that a financial benefit to me? Of course. It's a gift. You're describing a gift, but the repayment of a loan, Your Honor, is not a gift. But a third party is repaying my loan, and so the third party is providing a gift to me. Your Honor. I mean, that's just like, of course, right? If a third party says you're doing such a good job, I want to repay your loan for you. I mean, one day I had a $10,000 loan. The next day I don't. I'm $10,000 richer. Somebody just made me a $10,000 gift. Your Honor, if a contributor comes in and gives the candidate a $10,000 gift, then yes, that violates not just the gift statutes, but if there's a quid pro quo involved, the bribery statutes. This is a... That's the entire point of this law. I mean, the entire point of this law is that we start getting worried. When people start repaying the candidate's indebtedness, because that's just another way of putting money in his pocket. Your Honor, what about the rest of the campaign's debts? This campaign ended up with $2.7 million worth of debt. Only 10%, less than 10% of it was the candidate's debt. Is every contribution made after the election a gift to all of those creditors? Of course it's not, and nobody would view it that way. It's not a gift, Your Honor, when the debtor pays the creditor what the creditor is owed. And that's what we have here. Yes, it is true that all of the campaign's debts are paid by contributions limited by the base contribution limits. All of them are, but the candidate's debts don't stand in any different shoes from the ad agencies or the consultants or the landlords of the campaign. Mr. Cooper, does this statute apply any differently to candidates who lose than to candidates who win? No, Your Honor, it doesn't. It applies to losers as well as to winners, and in that respect, it's over-inclusive. It's under-inclusive in many respects, but it's over-inclusive in that respect. Counselor, what is the possibility that a loser is going to necessarily, or in most instances, get contributions afterwards? Your Honor, certainly losers of elections typically are not able to generate... Generally, we don't look at people who are not likely to be injured when we're deciding the constitutionality of the statute. Your Honor, to whatever extent the Section 304 and the loan repayment limit does operate on a loser to prevent repayment of a loan, it operates in the same way. Yes, I certainly concede that the opportunity for losers to generate post-election contributions are nothing like winners. Just to return briefly to this standing issue, accepting your stipulation, as Mr. Stewart does, about the $250,000 being paid out of pre-election funds, the statute itself imposes no burden on you paying the remaining $10,000 out of post-election funds, right? The statute does not. The regulation does not. If you accept his reading of... I know. We're beyond that. At least for purposes of the hypothetical. Yes, Your Honor. So it's only the regulation that imposes the injury on you. Now, you say, well, in your evocative manner, it's a parasite on the act, and so you should be able to challenge the act. And I'll give you that, again, for purposes of the hypothetical. But that's not the question. The question is, do you get a three-judge court? And in that respect, your challenge is only to the regulation, not to the constitutionality of the statute. And the parasite doesn't help you because, yes, if you're in district court, I think you're right, that you can challenge the statute that gave birth to the regulation, if you don't want to use the parasite. But that's a different question. The question is, your access to the three-judge district court. Mr. Chief Justice, with respect, I don't believe it is a different question. And it's not because the – it is true that the regulation is the immediate cause of the injury to the campaign and its inability to pay back $10,000 of that loan. But, Your Honor, that – the cause, it is fairly traceable to the statute itself. And even if we had never made a claim, any independent claim against the regulation, and had only made a constitutional claim – But you win – sorry to interrupt, but you win, regardless of whether the statute is constitutional or unconstitutional, if you're able to strike the regulation. For example, that it's arbitrary and capricious or some other administrative law basis. So you do not have the requirement of a constitutional challenge that's necessary to trigger the three-judge district court. Your Honor, if I had an independent constitutional challenge against the regulation, then I would not need to challenge and defeat the authorizing statute. Right, if you had a constitutional challenge to the regulation. Other than the notion that it was arbitrary and capricious. And yes, we did make that claim. But, Your Honor, if my only challenge to the regulation is that its authorizing statute is unconstitutional, I can still challenge the authorizing statute. I think that's right. If you're in district, normal district court, one judge up there, but if you're seeking a three-judge district court, I don't know that a challenge to the regulation is enough to get you in. Because you prevail if you strike the regulation down under arbitrary and capricious grounds, and you would be making that argument. And that's not a constitutional argument, that's an administrative law argument. But if I'd never even made those claims, and I'd only – Surely, Your Honor, the injury, the actual injury is fairly traceable. That's the standard here, fairly traceable to the host, if you will, authorizing statute. Think of this, because this is actually, I think, an unanswered question. And I don't know the answer. Imagine there's a challenge to the SEC, improperly constituted. And the person's hurt because of a regulation that says the agency is improperly constituted. And I don't think there's any problem, and we haven't had a problem reaching the constitutional issue. But does this three-judge court statute intend to pick up that kind of constitutional issue? Where the distance between what you're complaining about and the regulation that actually hurts you is pretty broad. Now, I have a hard time thinking the answer is yes, always you can. And I have a hard time thinking no, you never can. So any light you can shed on that, to me, would be appreciated. The light I want to shed on that is this court's standard with respect to the traceability of the injury itself. And I just don't think there's any question that the injury is fairly traceable to the statute that gave birth, Mr. Chief Justice, as you say, to the regulation itself. It did indeed visit the immediate injury on us. But it's like saying the murder committed by Frank Nitti is not traceable to Al Capone, the man who ordered and paid for it. It's clearly traceable. Our injury is clearly traceable. Do you think that this regulation is in fact authorized by the statute? We did not have an APA challenge that it was in excess of statutory authority. We did not advance that argument. And as I sit here today, I can't think of that argument. I think that the court, at least I don't believe we did. But, Your Honor, our claim from the beginning was that the 20-day regulation cannot survive an unconstitutional authorizing section 304. I mean, one of the things that makes this standing argument sort of weird and interesting is that the regulation actually doesn't seem to have all that much to do with the statute. In other words, the regulation imposes its own requirements that separate it apart from what the statutory requirement is. And usually where we see something like that and we say, well, the regulation went beyond the bounds of the statute, that's its own legal problem. I mean, here we're sort of thinking about this because of the way the standing arguments were presented. But separate and apart from standing, it just seems as though it's its own legal problem that this 20-day requirement is in there in the regulation when it's not mentioned or in some sense comprehended by the statute itself. And I'm wondering whether we have a statutory question before we get to any constitutional question. Your Honor, to whatever extent there are statutory objections to the 20-day regulation, the parties did not join that issue. To whatever extent. I mean, you can see it. It jumps off the page. I mean, you've got a statute that does not impose a First Amendment inhibition on a candidate. But some administrator in an agency said, well, I'm going to add a 20-day limit on these First Amendment rights. I mean, you're the one telling us how important they are. Why would you let an agency make this up on their own? I would have thought that would be the first count one in your complaint. And the only problem is that would have had to been brought before a single judge district court. That claim would, Your Honor, if we had brought it as count one. But count two, Your Honor, that that is the authorizing statute itself is unconstitutional. And so the regulation cannot survive it would articulate a a claim over which a three judge court would have would have a constitutional jurisdiction or statutory jurisdiction. Mr. Cooper, we generally don't ask questions during rebuttals. So I'm going to ask the question now that is similar to the one that you're being asked. And I hope Mr. Stewart will address it when he delivers his rebuttal. And that is whether the FEC is conceding that the 20-day limit is unlawful. There's pressure. He could not authorize it. Yeah, he hasn't. They haven't done it up to this point. I mean, neither one of you. I don't think either of you should be pressed to express a view on this issue, which is not the issue in the case. Mr. Stewart can respond to that as he chooses. I was just saying it's an interesting issue. Mr. Cooper, can I follow up on Justice Kagan's questions earlier? Because you were discussing with her whether it should be analyzed as an expenditure as a contribution. And you were pushing back and saying it should be an expenditure. But in your brief, you also argued, I believe, that even if the other level of scrutiny, closely drawn scrutiny, applied that attaches to other than expenditures, you still prevail. And I just wanted you to tell us why you think that. Thank you, Your Honor. Yes, we believe that any level of heightened scrutiny, closely drawn scrutiny under contribution limits, would doom this statute for the incongruities, if you will, that make it quite clear, and I would submit to you, Justice Kavanaugh, that the statute itself does not advance the interest that Congress may have in preventing quid pro quo corruption. Rather, it advances the illegitimate interest of incumbent protection and equalizing and leveling the playing field. Those interests fit this Section 304 like a glove, Your Honor. The quid pro quo claim, the quid pro quo corruption costume that the government knows it has to dress this statute in, because it's the only interest that this Court has accepted as sufficiently compelling to justify a drag on First Amendment rights, just doesn't fit. I have to say the opposite intuition. I mean, I understand the equalization argument, and if I think about it, I can understand how an equalization interest would support this law. But honestly, the thing that to me jumps off the page is that when contributors find a way to put money not in the campaign, but into a candidate's own personal pocket, when the question is contributors repaying indebtedness of the candidate so as to make the candidate himself financially better off, richer, that to me screams quid pro quo corruption interest, not equalization interest. Even if you attribute that interest to this statute, it just doesn't do it in a rational way. It places no limit, Your Honor, on the pre-election contributions that a candidate may use to repay the candidate and those alleged gifts to the candidate. It makes no limit on that. It only makes a limit on $250,000 of post-election contributions, and Your Honor, again, it only does that for the 87th maxed out contributor. It makes no sense to say that the first 86 get to make that gift, Your Honor. Those gifts apply no less to every other creditor of the campaign than they apply to the candidate himself, and the idea that those gifts is just not, I would submit, a serious point. And finally, those gifts are limited by the base contribution limits that this Court in McCutcheon made clear that Congress had made the judgment that they don't reflect or represent a cognizable risk of quid pro quo corruption. I finally got it. I finally got it. Your point is with $250,000, you're saying the 86 real evil people who are trying to corrupt everything, they jump in on second one because they know who to get because he's been elected. And actually, the other people who are a little slower on the mark, well, they can't get even a dime on this, and they're the ones who are more honest. So that's your point there, and with that arise, I see the point now, finally, and that's progress. And it's an interesting argument, but I think it's probably true of any dollar amount that's greater than the individual amount. That problem will arise. And the question is, is there something good about this that your clients should love? Because it's bigger than $2,900, and the reason that it's bigger is because their interest is on the other side. It seems that's how I've got it thought in my mind, and you can say I still don't understand it at all if you want. Your Honor, I'm hesitant to say you don't understand it. Thank you. Justice Thomas, anything further? Justice Breyer? Justice Sotomayor? Counsel, we know that after an election, your contribution as a contributor is not being used to promote a candidate because the candidate has already won. So it's not going to be an expenditure to promote your speech in electing the candidate. So my normal reaction is, why do you give after an election to a candidate who's not going to spend it on getting elected? He's going to spend it on something in the past, but certainly not nothing with respect to the actual election and his getting his post. And to me, that's a natural quid pro quo. I'm giving because I want to draw my attention to you. I guess I'm having a hard time understanding your counter-argument that that needs to be somehow proven. I mean, there were studies that the court below discounted. I'm not quite sure what the complete ground of discounting. Basically, but, you know, they showed that voting patterns by senators seem to tie into post-election contributions. And I think that's enough to support the sensical thinking that if money that I give is being used to pay the candidate, the candidate's going to pay more attention to me. What more do you need to prove that simple proposition? Congress hasn't limited post-election contributions. It allows post-election contributions both to be designated for the past election, if the individual contributor hasn't maxed out already, and it allows post-election contributions to be designated for the upcoming election. Congress obviously does not believe that in a post-election contribution, whether it's designated for the last election or for the next election, either of which can be used to retire all debts, including candidate debts of the previous election. So Congress does not see those post-election contributions as being payoffs quid pro quo. Now, in terms of I think the question implies and the government has stated that there can't be any legitimate reason for a post-election contribution. But, Your Honor, I would beg to differ with that. The first of all, as I've just mentioned, Congress hasn't in any way limited that. So Congress certainly believes there's a legitimate reason for post-election contributions. But even if they are just what the government has called make-up contributions designed for no purpose other than to associate now, exercise the First Amendment right to associate with the winner, and to hope that that will result in the kind of influence and access that support for a candidate begets, and that this court has in several different cases recognized that Congress cannot seek to deter, as opposed to seeking to deter and to prevent actual quid pro quo corruption, then those are reasons, Your Honor, those are reasons enough for a contributor to come after an election and make a contribution to the winner. It's just that the candidate has now become effectively an incumbent. But you just said the magic words, to make a contribution to the winner. Not to a campaign and for its debts, but for the pockets of the winner. That's a very different corrupting influence. Your Honor, to the extent that the post-election contribution pays for pre-election speech, it is paying for speech. If I go to a restaurant tonight and pay for my meal with a credit card, a month from now I will have to repay the credit card company for that meal. That's what these post-election contributions that actually retire debts pay for. Whether retiring the debt of a candidate or any of the other creditors, it's paying for speech that was uttered before and was financed through credit. The candidates and others uttered before the election. Justice Kagan? Justice Gorsuch? Justice Kavanaugh? One question. You had also mentioned that you think the statute is designed for or has the effect of incumbency protection. And I just wanted you to connect the dots and spell out why you say that. Your Honor, the Millionaire's Amendment, of which this was a part, in which this court struck down the other part, obviously in the Davis case, was enacted by Congress with explicit references to the fact that well-financed challengers to incumbents represented a threat, and that the then incumbents in Congress wanted to make sure there was a level playing field. The ability of a candidate to loan without repayment limits, such as the Section 304 places on the candidate, to loan money to his campaign, to advocate his own election, is a threat to incumbents, Your Honor, just as much as the ability to contribute or to make expenditures on behalf of the challengers' campaign. Justice Stewart? Thank you, Counsel. Thank you, Mr. Chief Justice. Mr. Stewart, rebuttal. Thank you, Mr. Chief Justice. Let me respond first to Justice Alito's question. We're not prepared to concede that the FEC regulation is invalid, but Apelles did challenge that in this lawsuit. That is, at page 26 of the Joint Appendix, Count 4 of Apelles' complaint alleged that the 20-day limit in the regulation was arbitrary, capricious, and not in accordance with law. And Count 5 asserted a different nonconstitutional challenge to the regulation. And the three-judge district court exercised supplemental jurisdiction over the regulatory challenges but held them in abeyance while it adjudicated the constitutional challenge to the statute. And I think that was for two reasons. First, the district court was under the misimpression that the statute itself was the current legal barrier to full repayment. And second, the three-judge court understandably viewed its mandate as being the resolution of challenges to the constitutionality of the statute. And then, having held that the statute was unconstitutional, it said, we're dismissing the regulatory claims as moot. The implication was, if the statute had been held constitutional, then the court would have proceeded to the nonconstitutional challenges to the regulatory provisions. And so the way the case was litigated produced this weird inversion of the way that litigation is supposed to be handled. That is, it's bedrocked that if you have both nonconstitutional and constitutional claims before you, the court is supposed to resolve the nonconstitutional issues first and proceed to the constitutional issues only if it is necessary to do so. And here the district court did the reverse because of the way that the case was pleaded and the fact that it was a three-judge court. The second thing I'd like to say is to follow up on something that Justice Kagan said when she pointed out this is really not a limit on self-financing or the ability of a candidate to spend money on his own campaign. It's a limit on the candidate's ability essentially to pass the expenses of campaigning along to others. And the appellee's response is the existence of this limit will create a disincentive to the making of candidate loans and that in turn will result in less campaign speech. And the court has sometimes resolved very similar claims where a candidate, as opposed to a contributor, will challenge contribution limits on the ground that they have an indirect effect on the campaign's ability to engage in speech. And the court has said from the candidate's perspective, so long as the limits are not so low that they prevent the candidate from amassing funds sufficient for effective advocacy, then the candidate has no valid constitutional challenge. The contributor may still have a constitutional challenge because the limits may impinge unduly on his own ability to affiliate himself with campaigns to assist in the electoral process. But the limit here really doesn't have that effect. The contributor can still donate as much as he wants up to the base limit, can do so at any point up until the election, can continue to do so after the election subject to the proviso that the funds can't be used for repayment of candidate loans. But since a contributor ordinarily has no legal right to insist that his donations be used for a particular purpose, that's a very small intrusion on any liberty that he might have. The third thing I wanted to say is about the leveling the playing field. The companion provision that was at issue in Davis, there was a leveling purpose apparent on the face of the statute because the statute said if one candidate spends a lot of his own money, then the other candidate will be able to raise more money himself. And so the rules that applied to one candidate were kind of contingent on what the other candidate did. That was leveling on its face. But there's nothing similar going on here. Yes, it's true that the loan repayment limit applies to each candidate in the race, but the rules that apply to one candidate don't depend on what his opponent does. The other thing about the fact that the loan repayment limit applies to losing candidates, I'd say three things. The first is what Justice Sotomayor said, that it doesn't have much practical impact on losing candidates because they can rarely raise sufficient post-election contributions to be over the limit. The second thing is that, as we see in Davis, ordinarily the presumption is that the same rules will apply to all candidates in a race, and indeed there can be constitutional problems even if they don't. And the third is, as the court said in Buckley, there are some circumstances where Congress decides that the same rules should apply to each candidate, even though the interests underlying a particular rule may not be as directly implicated by minor party candidates, for instance, who are unlikely to win and therefore are unlikely to do favors for the donor. Thank you, Mr. Chief Justice. Thank you, counsel. The case is submitted.